## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SONIA BENTLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 24-50 |
| v. | ) | Judge Nora Barry Fischer |
| | ) | |
| CONNELLSVILLE AREA SCHOOL | ) | |
| DISTRICT, JOSEPH BRADLEY, | ) | |
| SUPERINTENDENT, and AMY | ) | |
| COUGHENOUR, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION

## I.    INTRODUCTION

Currently pending before the Court is Defendants' Motion for Summary Judgment (Docket No. 40) in this employment discrimination and retaliation lawsuit in which Plaintiff brings claims against Connellsville Area School District ("the District" or "CASD"), Superintendent, Joseph Bradley ("Bradley"),[1] and Human Resource Director, Amy Coughenour ("Coughenour"), as follows:

Count I - 42 U.S.C. § 1981 (racial discrimination and retaliation against all Defendants);

Count II - 42 U.S.C. § 2000e, *et seq.* - Title VII, as amended by the Civil Rights Act of 1991 (racial and national origin discrimination and retaliation against the District);

Count III - 29 U.S.C. § 626 *et seq.* - the Age Discrimination in Employment Act ("ADEA") (age discrimination and retaliation against the District); and

---

[1] Superintendent Bradley left employment with CASD on July 6, 2023. (Docket No. 36 at ¶ 58).

Count IV - 43 P.S. § 951 *et seq.* - the Pennsylvania Human Relations Act ("PHRA") (parallel claims of racial, national original and age discrimination and retaliation against all Defendants).[2]

*See generally* Docket No. 35 (Plaintiff's Amended Complaint).

Plaintiff, a now 57 year old Asian woman, employed by the District from 2010 through December, 2024,[3] alleges that Defendants - for reasons of racial, national origin and/or age discrimination – imposed "unprecedented" interviews adding subjective criteria to their transfer/promotion assignments for clerical positions to which she applied (and which she would have otherwise been awarded on the basis of her seniority and clerical testing passed).[4] She further alleges that although the July 1, 2019 collective bargaining agreement between CASD and her union[5] gave CASD the discretion to include interviews/additional criteria beyond seniority (in a change to past practice), Defendants did so only when she applied to positions (which she would have otherwise received) in June, 2022 and thereafter, and awarded those positions to "substantially younger" and Caucasian applicants with less seniority. Moreover, Plaintiff alleges that despite asserting a new but uniformly applied practice, Defendants did not apply the articulated practices consistently and their use was pretextual. Finally, in addition to these

---

[2] As noted in Section IV, *infra*, the PHRA is construed consistently with interpretations of the parallel federal law referenced in text above.

[3] Plaintiff avers that she was "promoted to the position of Classroom Aide" in August 2019, although her own application indicates it was a position she had held since 2011. (Docket No. 35 at ¶¶ 8-9; Docket No. 42-2 at 4). It appears that Plaintiff was employed in the District's Special Education department. Defendants aver that at some time an Asian may have been employed by the District as a cafeteria or janitorial worker, although Bradley has no recollection of any Asian employee during his tenure; as on some other matters, the record is not further developed.

[4] Applicants to a clerical/secretarial position from a non-clerical position, such as Plaintiff's classroom aide position, were required to pass a clerical skills test. This test was updated and administered by the District at intervals deemed appropriate, *e.g.* as warranted by changes in technology and administrative/office/library procedures.

[5] *See* Docket No. 42-4 (July 19, 2019 - June 30, 2024 collective bargaining agreement between CASD and the Connellsville Area Educational Support Personnel Association) (the "CBA" and the "Union", respectively).

discrimination claims, Plaintiff alleges that Defendants retaliated against her for engaging in protected activities - *e.g.* her complaints of discrimination and prior retaliation to the School Board, the Pennsylvania Human Rights Commission ("PHRC"), and to the Court with the filing of her January 12, 2024  Complaint (Docket No. 1) – through false and retributive disciplinary actions and further denials of her applications for clerical openings.  *Id;[6] see also* Docket No. 45.

Defendants respond that the District's employment practices complied with the CBA and federal and state law, and that Plaintiff has failed to state any claim of either discrimination or retaliation.  Defendants seek, in the absence of a material fact question, summary judgment in their favor on Plaintiff's claims in the entirety.  More particularly, Defendants attest that the July, 2019 CBA "introduce[ed] changes to tiers and testing requirements" such that "seniority was no longer the only metric" and "the [changed] procedure . . . require[d] all applicants to undergo interviews and take a clerical test per the CBA." (Docket No. 41 at 2) (citing Docket No. 42, Defendant's CSMF at ¶¶ 6-9, 20). [7] They further attest that "any disciplinary actions taken by the District

---

[6] Plaintiff also alleges that in 2022-2023, Defendants (1) delayed approval of her Family Medical Leave Act ("FMLA") request and, after granting her "intermittent FMLA leave", required her to provide additional medical documentation for the days on which she utilized that leave for time off, and (2) provided younger Caucasian employees "clerical training that was denied to" Plaintiff.  (Docket No. 35 at ¶¶ 16, 23; Docket No. 36 at ¶ 20).  The Court notes that the record of the District's policies and practices regarding FMLA leave documentation ("intermittent" or other) appears surprisingly under-developed, and that the same is true with regard to clerical training.

Although Plaintiff makes sometimes oblique assertions that the District (a) sought to minimize the cost of clerical positions by providing advanced, focused training in the actual test content to new/part time employees; (b) advantaged aides who by the nature of their particular position could be available for substitute/fill-in clerical assignments and thus gain experience, over aides whose position did not afford opportunities to substitute/fill-in; (c) declined to provide her an alternate test time to accommodate a medical appointment; and (d) engaged in nepotism in clerical/secretarial training and promotion – none of these, without more, would support a claim of race or age discrimination. And the record here again is surprisingly undeveloped.

[7] *See also id.* at 2-3 ("All applicants . . . were subject to the same requirements: interviews and testing"); Docket No. 47 at  ¶ 57 ("cross-tier application(s) . . . necessitated to use of interviews and testing"); *id.* at ¶ 62 ("[t]he interview process was mandated pursuant to the provisions of the CBA").

Coughenour's testimony clarified/corrected, however, that not *all* applicants underwent interviews, as Defendants continued to preference the award of "lateral transfers" within a position/"tier" by seniority and considered additional

were legitimate and based on Plaintiff's own conduct." *Id.*

Upon careful consideration of the parties' submissions and the evidence of record, and for the reasons set forth below, Defendants' motion must, under the presently applicable standard, be denied.[8]  In brief, this action presents material fact questions which preclude summary judgment on Plaintiff's claims for race/national origin and age discriminatory denial(s) of promotion, as well as retaliation.  A jury could reasonably find that the record evidence, viewed under the currently applicable standards, sufficiently supports Plaintiff's claim to reach a verdict in her favor as to both discrimination and/or retaliation.  A jury could also quite reasonably find, however, that there is insufficient evidentiary support for each and every claim and that Defendant's determinations to award positions to other applicants and to take disciplinary actions against Plaintiff were each legitimate business decision within the terms of the CBA and based on non-discriminatory and non-retaliatory considerations (*e.g.*, Plaintiff's interview scores; extended disciplinary history of personal conflict; disregard of designated channels for employment-related communication; creation of workplace discord through broad and persistent complaint regarding multiple aspects of employment (including the performance of the District's administrators and Union representatives); and attendance/absence record).

---

factors (including interviews) when applications were made by staff for whom it would be a position/"tier" *promotion*. (Docket No. 42-6 at 33, 76, 88-90).  *See also* Docket No. 46 at 2 ("The 2019 CBA explicitly eliminated seniority as the sole factor for promotions and permitted interviews and testing when moving across tiers.").  This deposition testimony and later filing are consistent with the CBA as to the excusal of same-category applicants from interviews. And they appear more, yet not entirely, in keeping with the evidentiary record related to positions for which Plaintiff applied.  *See* Section IV, *infra*.

[8] The Court reminds the parties that the standard of proof it applies on motion for summary judgment differs significantly from that applicable to a jury's ultimate determination on Plaintiff's claims.

## II.    FACTUAL AND PROCEDURAL HISTORY

### A.    Factual History

The following facts are relevant, evidenced of record and read in the light most favorable to Plaintiff, as non-movant.  *See generally* Docket No. 35; Docket Nos. 40-42 (Defendant's Motion, Brief in Support, and Concise Statement of Material Facts ("CSMF")); Docket Nos. 44-45 (Plaintiff's Brief in Opposition and Answer with Counter Statement of Material Facts); Docket Nos. 46-47 (Defendant's Reply Brief; Defendant's Response to Counter Statement).  Evidentiary submissions were filed as exhibits to the parties' pleadings.  (Docket No. 42 and 45). [9]

Plaintiff was employed by the District beginning in 2010 and the prior history of her employment includes disciplinary action(s), such as an October, 2018 five day unpaid suspension which was grieved and revised to unpaid vacation with removal of the related documents from Plaintiff's employment record.[10] (Docket No. 42-2).

On November 7, 2018, CASD and the Union entered into a five-year CBA effective July 1, 2019.  (Docket No. 42-4).  The pertinent provisions include:

Under Section D. *Employee Assignments and Reassignments*, the provisions of which were effective on <u>*January 1, 2019*</u>, employees were to receive their next school year's assignment/building placement, including transfer assignments and salary by August 15th. Employees with the appropriate qualifications could request, in writing, transfer to a different class, building or position with "[f]inal determination of work assignment within a building

---

[9]  A recounting of factual background sufficient to this Court's denial of the pending motion includes circumstances/events regarding (a) Plaintiff's application for clerical positions and (b) the disciplinary actions taken against her between the late summers of 2019 and 2024.  As reflected in this Memorandum Opinion, and set forth in the parties' pleadings and exhibits, a significant number of material facts are less than fully developed or contested and will await the jury's credibility determinations.

[10] The Settlement Agreement, which expressed "no admittance of wrongdoing" by either CADS or Plaintiff, was passed by CASD's Board of Directors (the "Board") in November, 2019.

resid[ing] with the District".  Section D(7) provides: "<u>When an internal vacancy is posted, and an internal candidate applies who is already within that category (Appendix A), no testing or interviewing is necessary</u>."[11]

Under Section E. *Position Postings*, also effective on *January 1, 2019,* the Superintendent/designee would inform the staff in writing of any openings, and the annual posting period would begin June 1 and end August 1, with openings thereafter to be filled by a substitute. Section E(3) provides: "<u>Seniority alone will not be the basis for granting a transfer.  Other criteria *may be used as deemed appropriate* by the Superintendent</u>."

(*Id.* at pp. 24-26) (emphasis added).[12]

On June 14, 2019 Plaintiff applied for and was awarded the position of Middle School "personal student aide", which she indicated on her application was a position she had "been doing since 2011".  (Docket No. 42-3).[13]  From November, 2019 to April, 2020 the record reflects Plaintiff's multiple and often expansive emails to the new Director of Special Education and Board member, Nick Damico ("Damico") - and by Spring 2020 to additional Board members, District administration and a support unit - regarding personal and significantly broader employment,

---

[11] Appendix A designates Tier categories and provides annual salary rates for the contract years.  Aides are within Tier 4 (Highly Qualified), Clerks and Truant Officers are in Tier 3 (Testing Required), Nurses/LPNs are in Tier 2 (Certification Required), and Secretaries are in Tier 1 (Testing Required). (Docket No. 42-4 at 31-32).

[12] Importantly, then, the CBA provided CASD *the discretion*, effective in January, 2019, to consider other criteria, *e.g.*, interviews, in addition to seniority in awarding non-lateral (out of tier/category) transfers; and it exempted lateral transfer candidates from testing and interviewing as to that vacant position.  *Cf.* n. 7, *supra* (deposition testimony of Coughenour that lateral candidates were preferred (on the basis of straight seniority) for positions to which they applied).  The District continued to maintain and post updated seniority lists and designated seniority rank on its position application forms.

[13] A September 6, 2018 letter from the Director of Special Education denying Plaintiff's grievance indicated that she "had been with the same child for two years", was unsuccessful in her bid on two jobs during the 2017 and one during the 2018 bidding process, that "decisions for placement were also based on disciplinary records from the 2017-18 school year, and that the District "agree[d] to discuss and negotiate for the next contract" (*i.e.*, the 2019 posting/assignment period). It appears that this June, 2019 assignment was, under the CBA, an interview-exempt lateral assignment.  *Cf.* Document No. 45 at ¶ 48 (Plaintiff's assertion of it as evidence that the District continued to follow its prior practice of promotion by seniority).

representation, Covid pandemic adjustments/protections/compensation, and other matters which the District, in its objections, reasonably characterizes as inappropriate direct communications in contravention of its procedures and of the role of the Union. (Docket No. 42 at ¶¶ 12-15; Docket Nos. 42-7; 42-9).[14] On April 14, 2020, Bradley wrote to Plaintiff – who was apparently on leave at the time - responding to various complaints raised in her communications (including prior discipline), advising that the District could not negotiate employment terms directly with an employee, and directing that she follow protocols/procedures as to public versus personal/employment concerns and not communicate directly with Board members regarding the latter. (Docket No. 42-10). In June, 2020, Plaintiff took the Secretary/Clerk/Truant Officer Exam (the "Exam") and scored 43%. (Docket No. 42-11). Thereafter, she received a top ranking of "Excels in Performance" in each of the 11 categories of evaluation in her 2020-2021 Special Education Support Professionals Performance Appraisal completed by Damico as Director of Special Education. (Docket No. 45-34).[15]

On August 3, 2021, Plaintiff requested leave under the FMLA from August 3, 2021 through September 28, 2021 for her own "serious health condition", which was granted on August 31st. Her leave was then extended at her request, first to December 31, 2021 and thence – as a personal unpaid leave of absence, rather than leave under the FMLA (at her request) - through the end of the 2021-2022 school year. (Docket No. 42-12).[16]

---

[14] The record of this period also indicates that Plaintiff was reprimanded in (1) Spring 2018 for inappropriate contact with a student's parent (a matter apparently separate from that settled on November 20, 2019 and as to which she was still challenging the policy violation alleged in correspondence to various administration/Board members, and seeking its removal from her record) and again in (2) March 2020 for inappropriate physical interaction with a child (for which she participated in additional training). (Docket Nos. 4-7 and 4-8).

[15] The record does not appear to contain performance appraisals for any other school years.

[16] Plaintiff requested this change to personal leave to alleviate FMLA leave "paperwork [which would] overlap and be redundant" and explained that although her (cancer) treatments would be intermittent, her depleted immune status made any exposure to students during the pandemic a concern.

On February 15, 2022, Coughenour prepared an internal memo recommending that the District conduct interviews and consider the specific criteria of absentee and disciplinary records and job evaluations for the tier positions. (Docket Nos. 42-16 and 45-20).[17] In May, 2022, Plaintiff again took the Exam, with dramatic improvement and a score of 91%. (Docket No. 42-13).[18] And on June 22, 2022, when assignments for a West Crawford library clerk and office clerk were both open for the upcoming school year, Plaintiff bid. Three candidates applied – Karen Hollis, a Caucasian of unknown age with a seniority rank of 49, then in a middle school classroom aide position (1st choice office; 2d choice library); Tammi Wascak, a Caucasian of unknown age with a seniority rank of 91, then a clerk in a temporary/substitute secretary assignment (1st choice office, 2d Choice library); and Plaintiff, then age 54, with a seniority rank of 50 and in a middle school special education classroom aide position (1st choice library, 2d choice office). Hollis

---

[17] Coughenour notes that the CBA gives the District this "managerial right" and that she felt "it is in the best interest of the District to screen candidates and hold interviews, if deemed necessary by the District". She states that during her own "extended medical leave of absence" from November, 2020 through September, 2021, interviews were conducted "for several secretarial/clerical openings, without incident", adding that while not every "posting may require screenings and interviews, the District does have the discretion to use criteria other than seniority to select the best candidate for [an] open position." The Court notes that the memo appears to propose discretionary, rather than uniform, application of additional criteria and does not mention the CBA's exclusion of testing and interviewing for lateral assignments. Coughenour goes on to include the "Potential Screening Criteria" that she had "developed [with this in mind, and] which may be used in conjunction with the interview process". They include, for Clerks: "may require interview; 80% or higher on exam; personnel items considered, but not limited to absenteeism, disciplinary issues and evaluation." The same criteria apply to Building and Department Secretaries, with the additional factor of office experience for both and a minimum exam score of 90% for Department Secretaries. (Docket No. 42-16).

The Count finds in the record no direction to or documentation of interviews/selection criteria for other secretarial/clerical positions between, *e.g.*, January 1, 2019 and June, 2022. Plaintiff avers that (1) Defendants were aware of her intention to retake the clerical exam and apply for a transfer position in June, 2022, and (2) the internal memo and implementation of interviews/additional assignment criteria – in advance of her return from leave - were intended to provide pretext for denying her applications for the 2022-2023 school year. *See generally* Docket No. 45; *cf.* Docket No. 45-24 (Plaintiff's April 15, 2022 email to Coughenour continuing to complain about nepotism, inconsistencies in criteria for promotions, unfair testing, and shortcomings in Union representation).

[18] Non-lateral applicants were required to attain a score of 80% or higher on the most recent Exam "given 2019 to present." (Docket No. 42-14 at 2).

received her first choice, office clerk, and Wascak received her second, library clerk.  (Docket No. 42-17).[19]

In mid-July 2022, when an assignment for a Dunbar Township office clerk opened, Plaintiff and three other current aides applied:  Plaintiff (age 54, classroom aide and seniority rank 50); Jennifer Steyer (age 39, building aide and seniority rank 51); Toni Sanner (age mid-30s, classroom aide at Dunbar Township and seniority rank 68); and Mary Hixon (age 40, classroom aide and seniority rank 72).  Plaintiff attests she was informed she was required to interview, which was to her knowledge "unprecedented".  All four candidates were interviewed (with scores of 66, 116, 113.5 and 75.5 (out of 160), respectively).  Although Plaintiff would have been "next in line" for the position by straight seniority and qualified by her Exam score, the position was awarded to Sanner based on her "entire application" and in consideration of her familiarity with the Dunbar Township location. (Docket Nos. 42 at ¶¶ 19-20; 42-14 and 42-25).[20]

---

[19] Although Defendants assert that the three candidates were interviewed, Plaintiff disputes this and notes a lack of evidentiary support.  (Docket No. 45 at 4 ("The cited deposition testimony does not establish that the three candidates were interviewed.")).  The application/award documentation provided by Defendants does not include any record of interviews/scores or other criteria considered.  In addition, although Defendants represent that both Hollis and Wascak *may be* about the same age or older than Plaintiff, Plaintiff contests this and their ages do not appear to be of record. *See* Docket Nos. 42-17; 42 at ¶¶ 21-22.  *See also* Docket No. 42-6 at 35) (Coughenour's testimony that she *believes* Hollis was "close to the same age as" Plaintiff).  The Court observes that it would be preferable for the ages of candidates to be established by documentary evidence rather than competing expressions of belief.  *Cf.* Fed. R. Evidence 701 (opinion testimony by lay witness may be offered if (a) rationally based on the perception of the witness and (b) helpful to . . . determination of a fact in issue).  That said, the present record presents an unresolved question of fact.

Finally, Plaintiff fairly notes that Wascak, despite her status as a lateral applicant, was not preferenced for her first choice over Hollis yet was preferenced for her second choice over Plaintiff, despite Plaintiff's significant seniority. That is, the West Crawford assignments appear consistent with neither the District's prior policy/practice of straight seniority (Hollis and Bentley) nor its asserted new policy/practice of  (a) lateral preference by seniority and (b) seniority plus interview/other criteria for non-lateral applicants (Wascak and Hollis).  (Docket No. 45 at ¶  21). Moreover, although Wascak's application form is noted (beside the "x" cross out of her first choice) as "Karen higher seniority", Defendants represent that Plaintiff was denied an assignment because it was awarded to Wascak as "a lateral applicant". *Id.*  Coughenour's testimony also appeared to reflect confusion over these results, as she incorrectly concluded from the assignment awards that the library position had been Wascak's first choice.  (Docket No. 42-6 at 33, 76).  *Cf. supra* n. 6; Docket No. 45 at ¶ 53 (Wascak was the "Union president's sister").

[20] The PHRC's related finding and case closure letter indicates that Defendants conducted interviews for this position because all applicants "lacked experience", and that Plaintiff had not sought an aide position in which she could gain clerical experience through her availability to "fill in".  (Docket No. 42-25). *Cf. supra*, n. 6.  Plaintiff herself indicated

There followed a protracted flurry of Plaintiff's communications (including once more directly to Board members) alleging discriminatory treatment by Defendant and filing of formal charges with the PHRC, and disciplinary actions by the District:

On multiple occasions during the following month, Plaintiff communicated to Bradley, Coughenour, members of the Board and the Solicitor (and requested to meet in private session with the Board) raising allegations of race and age discrimination, attesting that a Caucasian co-worker had not been required to interview for a similar position at another school a few months prior,[21] and complaining of delays in approval of her request for another FMLA leave.  On August 26th, Plaintiff received a reprimand for continued failure to comply with District policy and directives regarding inappropriate communication with the Board (referencing Plaintiff's August 17th email and conduct at a Board meeting on August 24th). (Docket Nos. 42 at ¶ 23; 42-18; 45 at ¶¶ 65-68; 45-6 through 45-8).

On September 2, 2022, Plaintiff received a reprimand for bullying another employee, Katie Wiltrout on the same day as the prior reprimand noted above - August 26th – a charge which she disputes as false and retaliatory;[22] on September 9th, she filed a PHRC complaint of race and age discrimination and retaliation against the District; three days later, on September 12th, she received a written reprimand for communications to the Board president on August 28-30; and on November 3, 2022 she filed her second PHRC complaint, for retaliation - against the District and

---

[21] Defendants assert that this assignment was exempt from interviews as a lateral transfer.

[22] Wiltrout had been given a temporary/"sub" placement as a library clerk and reported that Plaintiff interacted with her about her presence in that position in a way that was "not mean" but made Wiltrout uncomfortable. (Docket No. 42-19) (attaching Wiltrout's reporting of incident, which she recounts as being "accosted" by Plaintiff, who was "intimidating" and told Wiltrout that she was going to "fight" for the job, which was rightfully hers).  The PHRC's related finding and case closure letter also indicates that Plaintiff confirmed the interaction.  (Docket No. 42-25).

in correspondence that she felt her "interview was poor at best" and that Sanner was "a better fit for that building". (Docket No. 42-25 at 6).

Coughenour - and received a four-day suspension for her alleged October 6-7 aggressive harassment/"bullying" of another employee, Shania Medvic (which alleged incident was investigated by Coughenour) and again violating procedures (essentially by ignoring communication procedures and fomenting workplace discord/distress with several aides/teachers around her denials of promotion). (Docket Nos. 36 at ¶¶ 19-22 ; 42 at ¶ 27; 45 at ¶¶ 69-73; and 42-19 through 42-23, respectively).[23]

The records of April 26 and May 1, 2023 suggest difficulties in Plaintiff's relationships with Coughenour, administrative staff and colleagues regarding an upcoming re-administration of the Exam and related workshop.[24] On August 7, 2023 (within approximately nine to twelve months of the events of the prior summer-fall in which Plaintiff was denied promotion to three (3) clerical assignments, communicated allegations of discrimination/retaliation, and was disciplined for inappropriate communications and personal interactions), Plaintiff wrote to Bradley and the administration/Board "as a taxpayer" with criticisms of Coughenour, improper job post/bid practices, mismanagement, malfeasance and administrative failures/misconduct on the part of the Human Resources department, and her pending Right-to-Know requests. (Docket No. 45-35). On

---

[23] Plaintiff again alleges that the discipline imposed was retaliatory. As with her sanction for inappropriate interaction with Wiltrout, the PHRC's related finding and case closure letter indicates that the employee directly involved communicated her objections to the conduct to the District. It also notes that Plaintiff declined to respond to allegations at her Loudermill hearing, and that other employees complained to the District of Plaintiff's workplace conduct "towards them over a period of several months". (Docket No. 42-24). *See also* 45-32 at 1-3 (notes of interviews with other employees regarding October 6th incident); *id.* at 4 (contemporaneous internal memo to Damico and Coughenour from a supervisory employee reporting Plaintiff's interaction with Medvic, which was overheard by other employees).

Plaintiff also alleges that the incident for which she was disciplined did not meet the definition of "bullying" under the policy cited. (Docket No. 45 at ¶ 73). *Cf.* Docket No. 45-13 (Policy - defining "bullying" as intentional and "severe, persistent, or pervasive" conduct which has the effect of "substantial interference" with an employee's work performance, "creation of a threatening environment", or "substantial disruption of the orderly operation of the school").

[24] *See* Docket Nos. 45-30 and 45-31 (Coughner's documentation/internal correspondence regarding an alleged parking lot altercation with Plaintiff and her alleged disruption of the Exam workshop). *But cf.* n. 41, *infra.*

August 23rd, the District's counsel served Plaintiff a letter requiring that she "cease and desist all . . . communications with any [CASD] board member or administrator . . .", issued after she had filed charges with the PHRC, was represented by counsel, and had assertedly been repeatedly directed to communicate through the District's counsel. (Docket No. 45-16). An exchange of emails with Plaintiff and between District administration members from April 21st through 28th also indicates substantial continued discord regarding Plaintiff's employment as an aide.[25]

The following Spring, on April 19, 2024, Plaintiff applied for multiple open clerical/secretarial positions; a "mass interview" was scheduled for June 18th and postponed to June 19th; and Plaintiff was unsuccessful in her applications for a clerk or secretary position, which were "again offered to younger Caucasian applicants." (Docket Nos. 36 at ¶ 26; 45 at ¶¶ 85-86). Sixteen applicants were interviewed for a total of nine awarded positions: Five Tier 1 Secretary, Three Tier 3 Clerk; and One Tier 3 Truant Officer. (Docket Nos. 42-30; 41 at 9). The record indicates, as a typed entry on the District's "Candidate Screening Rubric" ("CSR") form, that a "[d]ecision was made to interview all candidates and select based on screening, interview and building level administrative input". *Id.* at 3.[26] The CSR lists the 16 applicants with +5 scoring

---

[25] On August 21st, Plaintiff wrote to Damico and others, regarding continuing personal/working relationship problems, continued denial of "rightful" placements, and desire to change her position. On August 25th she exchanged emails regarding her refusal of a "resource classroom aide" position offered when she objected to a 2023-24 "emotional support classroom aide" assignment; in it, Plaintiff objects to being forced to either accept a made up position or remain in a "contentious" situation because Coughenour, from personal animus and retaliation, is denying Plaintiff's preferred "Life Skills" assignment. On August 28th, Damico reported an unpleasant interaction with Plaintiff - regarding her employment complaints and desire to speak to the Board in executive session regarding Bradley and Coughenour – from which Damico and Jill Youdell, who was also present, had difficulty extracting themselves. (Docket Nos. 45-26 through 45-29). Plaintiff objects that the District took no action in response to her August, 2023 complaints. (Docket No. 45 at ¶¶ 79-84).

As noted *infra*, Plaintiff filed this action on January 12, 2024. Thereafter, the only relevant correspondence of record until June, 2024 appears to be communications from Coughenour's department to Plaintiff in late March and April informing her that she had exhausted (and then exceeded by .5) the 10 contractual unpaid days granted on October 6, 2023 and asking her to be in contact regarding additional unpaid time. Plaintiff responded that Coughenour should reach out to her attorney regarding employment matters. On May 7, 2024, Plaintiff was issued a reprimand for overuse of leave and violation of policy. (Docket Nos. 42-28 and 42-29).

[26] It is unclear why lateral applicants were included in screening and interview processes, given the CBA exemption

columns for the following: Exam score above 90%; >1 year secretary/office clerk experience in District; current secretary/office clerk; and met/exceeded expectations on current performance appraisal. It includes +10 scoring columns for absenteeism not exceeding annual allotment and no disciplinary issues.[27]

## B.    Procedural History

Plaintiff commenced this action by Complaint filed on January 12, 2024, and thereafter amended, and brings the claims set forth above. As also noted above, discovery being completed, Defendants filed the pending motion for summary judgment, which is fully briefed and ripe for disposition. The only remaining procedural history of import is Plaintiff's proper exhaustion of her claims – which Defendants have waived and do not raise in their affirmative defenses. (Docket No. 35 at ¶ 2; Docket No. 36).

## III.    APPLICABLE STANDARDS OF LAW

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party,[28] the "materials in the record, including depositions, documents, electronically stored

---

provision and testimony regarding their continued assignment by seniority. Two lateral secretary applicants (McClain and Steyer) were awarded positions. A third current secretary (Kosinski, who had a perfect screening score and lists her position as Guidance secretary) was not assigned, and the record does not indicate if this was a temporary/substitute assignment (*i.e.*, a non-lateral application). The one lateral clerk applicant (Cornish) was also awarded a lateral transfer.

The Court notes that in defense to Plaintiff's claim of age discrimination Defendant points to McClain and Wascak as the two individuals awarded a position for which Plaintiff applied and "believed" to be the same age or older than Plaintiff. However, under the lateral transfer practices espoused (and expressly testified to as to Wascak), these were to have been non-discretionary assignments. (Docket No. 41 at 12).

[27] Under this rubric, Plaintiff's screening score was 5/40 as she earned points only for her performance appraisal.

A blank Interview Rating Form - providing places for the five interview team members to enter their notes and scores for each applicant's response to four questions - is of record, although the completed forms are not. *Id.* at 5-6. Each application, with notations of "Congratulations" to those accepted is also of record. The Court notes that no designated space for or notation of seniority rank appears on the screening or interview score charts, nor on the updated application forms. *Id. Cf.* Section II(A), *supra*, at 6 (quoting provisions of CBA, Section E. *Position Postings* regarding discretion to consider other factors in addition to seniority).

[28] *See e.g.*, *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007) (noting that the court must interpret the facts

information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a) & (c)(1)(A).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact; that is, the movant must show that the evidence of record is insufficient to carry the non-movant's burden of proof.  *Id.*  Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting FED.R.CIV.P. 56(e)) (emphasis added by *Matsushita* Court).

An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty-Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In *Anderson*, the United States Supreme Court noted the following:

> [A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.  . . .  [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Id.* at 249-50 (internal citations omitted).  *See also McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005).[29]

_____

in the light most favorable to the non-moving party and draw all reasonable inferences in its favor).

[29] In summary, the inquiry under a Rule 56 motion is whether the evidence of record (a) presents a genuine dispute

IV.    **ANALYSIS**

A.    **Plaintiff's Evidence Is Sufficient to Support a Reasonable Jury's Finding of Discriminatory Race or Age-Based Denials of Promotion[30]**

As set forth in both parties' briefs on the pending motion, Plaintiff's claims of race/national original and age discrimination are considered under the same familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), when, as here, she relies on circumstantial evidence.[31]

Under this framework, a plaintiff must first establish a prima facie case of race or national origin discrimination by pointing to evidence supporting that she (1) is a member of a protected class; (2) suffered an adverse employment action; (3) was qualified for the position sought; and that (4) the action occurred under circumstances that give rise to an inference of intentional discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). (Docket No. 42 at 5). And she must similarly first establish a prima facie case of age discrimination by pointing to evidence supporting that she: (1) is at least forty years old; (2) suffered an adverse employment decision; (3) was qualified for the position in question; and (4) was replaced by someone sufficiently

_____

over material facts so as to require submission of the matter to a jury for resolution or (b) is so one-sided that the movant must prevail as a matter of law. It is on this standard that the Court has reviewed the pending motion.

[30] The PHRA is construed consistently with interpretations of the parallel federal law/acts and the Court of Appeals for the Third Circuit has determined that a single analysis of Plaintiff's claims is appropriate. *See e.g., Davis v. Pittsburgh Pub. Schs*., 930 F.Supp.2d 570, 597 n.12 (W.D. Pa. 2013); *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (citations omitted). Accordingly, Plaintiff's Count IV claims under the PHRA are discussed by reference to the federal law analysis herein.

[31] Although the Supreme Court formulated the *McDonnell Douglas* framework in cases involving Title VII, the United States Court of Appeals for the Third Circuit has consistently applied that framework in cases where direct evidence of discrimination is not presented and which arise under federal antidiscrimination statutes, such as the ADEA. *Smith v. City of Allentown*, 589 F.3d 684, 689–91 (3d Cir. 2009); *Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007); *Monaco v. Am. Gen. Assurance Co.*, 359 F.3d 296, 300–01 (3d Cir. 2004); *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951 (3d Cir. 1996). *See also* Docket No. 41 at 5 ("The burden-shifting framework outlined in [*McDonnell Douglas*] is used to analyze a discrimination claim under Section 1981.") (citing *Ocasio v. Lehigh Valley Family Health Ctr.*, 368 F. Supp. 2d 370, 375-376 (E.D. Pa. 2003)).

younger so as to support an inference of discrimination. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (citing *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc)).[32]

The question of whether a plaintiff has established her prima facie case is a question of law to be determined by the court. *Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007) (citing *Sarullo v. U.S. Postal Serv.,* 352 F.3d 789, 797 (3d Cir. 2003)). When that determination is made in her favor, the burden then shifts to the employer to articulate some legitimate non-discriminatory reason for the adverse employment action. *McDonnell Douglas,* 411 U.S. at 802. Once the employer carries its burden, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the legitimate reasons proffered by the employer were not the true reasons but were merely a pretext for discrimination. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). At all times, the ultimate burden of proving intentional discrimination remains with the plaintiff. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).[33]

### 1. Plaintiff's Prima Facie Case

As set forth in Section II(A), Plaintiff (1) was both an Asian (Korean) woman and 54 or more years old at the time(s) of the discriminatory conduct alleged; (2) suffered an adverse employment decision (denial of promotion); and (3) was qualified for her position. The fourth

---

[32] A prima facie case raises an inference of discrimination sufficient to shift the burden of production to the defendant because the court presumes that certain actions, if left unexplained, were "more likely than not based on the consideration of impermissible factors." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978). *See also Venter v. Potter*, 694 F.Supp.2d 412, 422 (W.D. Pa. 2010), *aff'd*, 435 F.App'x. 92 (3d Cir. 2011).

[33] *See also e.g., Willis*, 808 F.3d at 644 ("To succeed on an ADEA claim, a plaintiff must establish, by a preponderance of the evidence, that age was the 'but-for' cause of the adverse employment action."); *Murphy v. Ctr. For Emergency Med. of W. Pa*., 944 F. Supp. 2d 406, 428 (W.D. Pa. 2013) ("It is not sufficient to simply show that age was a motivating factor."). As discussed in Section IV(A)(4), *infra*, however, "[a]t the summary judgment stage, Plaintiff need not establish pretext by a preponderance of the evidence, but rather must simply point to sufficient evidence that raises a genuine issue of material fact." (Docket No. 44 at 7) (quoting *Sheridan v. E.I DuPont de Nemours and Co*., 100 F.3d 1061, 1067 (3d Cir. 1996) (en banc)).

factor of Plaintiff's prima facie case requires evidence that the action occurred under circumstances giving rise to an inference of intentional discrimination, which as to age discrimination may be shown by evidence that someone "sufficiently younger" was awarded the position.[34]

Plaintiff has presented testimony and other evidence that Defendant used two different and inconsistent assignment protocols to award both West Crawford clerk positions for which she applied to (1) an individual with slightly more seniority than Plaintiff (who was preferenced over the lateral transfer applicant), and (2) the lateral transfer applicant, who had less seniority than Plaintiff.  As illustrated in Section II(A), she has also more generally evidenced material fact questions regarding the timing and consistency of the District's preferencing of lateral applicants; discretionary (versus mandatory) use of interviews and additional criteria, the formulation and adoption of those criteria, and the continued inclusion of any consideration of seniority, in repeatedly awarding transfers to her detriment (*i.e.*, to younger Caucasian applicants).[35]

### 2.  Defendants' Proffered Legitimate Non-Discriminatory Reason

The burden shifts to Defendants to articulate a legitimate, non-discriminatory reason for its employment action, and said burden is "relatively light." *Fuentes*, 32 F.3d at 763. To sustain this burden, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254. Rather, the inquiry concerning whether Defendants met their burden of production "can involve no credibility assessment," since "the burden-of-production

---

[34] *See Showalter v. Univ. of Pittsburgh Med. Ctr.*, 190 F.3d 231, 236 (3d Cir. 1999) (finding age difference of 8 years between plaintiff and retained employee sufficient); *id.* (citing *Sempier v. Johnson & Higgins*, 45 F.3d 724, 730 (3d Cir. 1995) ("holding that the fourth prong of a prima facie age discrimination case was satisfied where plaintiff was replaced by two individuals – one who was four years younger than plaintiff and the other who was ten years younger")). *See also id.* ("In order for a plaintiff to satisfy the 'sufficiently younger' standard, we have noted that there is no 'particular age difference that must be shown,' but while '[d]ifferent courts have held . . . that a five year difference can be sufficient, . . . a one year difference cannot.'") (quoting *Sempier*, 45 F.3d at 729).

[35] *Cf. supra* at n. 19.  And as discussed *infra*, although other potential, non-discriminatory reasons for the District's assignments may be readily apparent, at this juncture and on the record the parties have elected to provide, the Court cannot rule out a reasonable jury's resolution of material fact and credibility questions in Plaintiff's favor.

determination necessarily precedes the credibility-assessment stage." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993). "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion" that the challenged employment action was taken for legitimate, nondiscriminatory reasons. *Fuentes*, 32 F.3d at 763.

Defendants assert that Plaintiff was denied promotions because other candidates were found more qualified and awarded the positions for which she applied on the basis of (lateral transfer preference and/or) additional criteria, including interview performance, implemented in accordance with the provisions of the CBA. It has met its light burden by presenting testimony and other evidence in support, including, *e.g.*, evidence of Plaintiff's protracted (and sometimes disruptively vocal) dissatisfaction with multiple aspects of her employment situation; personal interaction difficulties and dissatisfactions with administrators, Union representatives and colleagues; failures to follow communication protocols and difficulty accepting redirection thereon; attendance record; and poor performance on interviews.

### 3. Plaintiff's Evidence of Pretext

To overcome Defendants' proffered legitimate non-discriminatory reason for its action, the burden shifts to Plaintiff to prove by a preponderance of the evidence that said reason was *not* the true reason for Defendants' adverse action but was merely a pretext for discrimination. *Willis*, 808 F.3d at 644. To meet this burden, Plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes,* 32 F.3d at 764 (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510-11 (1993); *Ezold v. Wolf, Block, Schorr & Solis-*

*Cohen*, 983 F.2d 509, 523 (3d Cir. 1992)).[36] These two prongs of the *Fuentes* test are *distinct*. *Keller*, 130 F.3d at 1108–13.  Under this Court's analysis of the first independent prong, Plaintiff has met her burden to present evidence of pretext and disputed factual issues remain which preclude summary judgment.[37]

The first prong of the *Fuentes* test focuses on whether Plaintiff has submitted evidence from which a factfinder could reasonably disbelieve the employer's articulated legitimate reasons for the adverse action. To satisfy this prong and discredit the employer's proffer, Plaintiff cannot simply show that Defendants' decision was wrong or mistaken, since the factual dispute at issue is whether the employer was motivated by discriminatory animus.  Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them "unworthy of credence," and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons." *Fuentes,* 32 F.3d at 765 (quoting *Ezold*, 983 F.2d at 531, 533) (other internal citations omitted).[38]

---

[36] As the Court of Appeals has explained:

> To establish such circumstantial proof, the plaintiff first must present evidence that each of the defendant's reasons is pretextual, *viz*, each reason was "a *post hoc* fabrication or otherwise did not actually motivate the employment action." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir.1994). This proof of pretext then may be combined by the factfinder with the evidence used to support the plaintiff's prima facie case of . . . discrimination, and from this union, the factfinder may reasonably infer that the defendant discriminated against the plaintiff . . . . *Hicks*, 509 U.S. at 511, 113 S.Ct. at 2749.

*Ryder v. Westinghouse Elec. Corp.,* 128 F.3d 128, 136 (3d Cir. 1997) (footnote omitted).

[37] The Court emphasizes that it does not, in ruling on this motion, consider the weight of her evidence beyond its sufficiency to survive summary judgment.

[38] *See also Keller*, 130 F.3d 1101, 1109 (3d Cir. 1997) ("'The question is not whether the employer made the best, or even a sound business decision; it is whether the real reason is [discrimination].'") (quoting *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir. 1996)).

As discussed in detail in Section II(A), *supra*, Plaintiff has presented evidence from which a fact finder could reasonably disbelieve Defendants' articulated reasons for the repeated denials of promotion based primarily on their degree of inconsistencies or contradictions. And, as referenced in Section IV(A)(1), *supra* at 17, the record leaves material fact questions. More generally, the evidentiary record presented in support of this motion does not support unambiguously or with unquestionable credibility Defendants' stated non-discriminatory reason(s) for their adverse employment actions. Thus, while it is certainly conceivable that those actions were motivated by legitimate business causes, it is also reasonably conceivable that the proffered reasons for denying Plaintiff's applications for other positions were not the true ones.

When, as here, the Court concludes that a defendant's proffered reason for adverse employment action raises material fact questions and credibility issues which preclude summary judgment, the Court must then respect "the importance of having the witness examined and cross-examined in the presence of the court and jury." *Losch v. Borough of Parkesburg, Pennsylvania*, 736 F.2d 903, 909 (3d Cir. 1984). The relevant inquiry at this juncture is whether, from the evidence now available, a jury could reasonably infer that Defendants illegally discriminated against Plaintiff. *See e.g., Graham v. F.B. Leopold Co*., 779 F.2d 170, 173 (3d Cir. 1985); *cf*. n. 33, *supra*.    The Court must answer that inquiry in the affirmative and accordingly denies Defendants' motion for summary judgment as to Plaintiff's discrimination claims.

### 4. Plaintiff's Ultimate Burden

In denying summary judgment, however, the Court reminds the parties that to establish Defendant's liability, Plaintiff must ultimately convince the trier of fact that a *discriminatory animus was the real reason* for the adverse employment action at issue. *Fuentes*, 32 F.3d at 765. "Liability cannot be established upon a jury's mere disbelief of the defendant's proffered reasons

for an adverse employment action, but rather upon the jury's affirmative belief of the plaintiff's contention that the action was taken on the basis of an impermissible discriminatory criterion." *Venter v. Potter*, 694 F.Supp.2d 412, 423 (W.D. Pa. 2010), *aff'd*, 435 F. App'x 92 (3d Cir. 2011) (citing *St. Mary's Honor Ctr.*, 509 U.S. at 519) ("It is not enough, in other words, to disbelieve the employer; *the factfinder must believe the plaintiff's explanation of intentional discrimination*.") (emphasis added).[39] To that end, "[e]vidence that an employer's proffered reasons for an adverse employment action are false, when coupled with a plaintiff's prima facie case, may sufficiently undermine the employer's credibility to enable a reasonable trier of fact to conclude that illegal discrimination has occurred." *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147–48 (2000)).  The Court has found only – on considering the evidence before it as a whole and under the standards explicated above – that a reasonable jury could so conclude.

**B.    Plaintiff's Evidence is Sufficient to a Reasonable Jury's Finding of Retaliation**

Under the applicable *McDonnell Douglas* burden-shifting framework, and as set forth in the parties' briefings, to state a prima facie case of retaliatory discrimination a plaintiff must plead that (1) the plaintiff engaged in protected activity, (2) the employer took an adverse employment action against [her], and (3) there was a causal link between the plaintiff's protected action and employer's adverse action.'" *Szewczyk v. United Parcel Serv., Inc.*, No. 19-1109, 2019 WL 5423036, at *6 (E.D. Pa. Oct. 22, 2019).  *See also Berrada v. Cohen*, 792 F. App'x 158, 164 (3d Cir. 2019) (citing *Darveau v. Detecon*, 515 F.3d 334, 340 (4th Cir. 2008)).[40]

---

[39] *Cf. McLaughlin v. International Brotherhood of Teamsters, Local 24*9, 641 F. Supp. 3d 177, 205 (W.D. Pa. 2022) (noting that employee's age must have "actually played a role in the employer's decision-making process and had a determinative influence on the outcome of that process").

[40] The ADEA's anti-retaliation provision similarly prohibits an employer from discriminating "against any of his employees . . . because such individual . . . has opposed any practice made unlawful by this section." 29 U.S.C. § 623(d). To establish a prima facie case for retaliation, the plaintiff must demonstrate "(1) [that she engaged in] protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse

Defendants assert that Plaintiff's claim of retaliation must fail because she was reprimanded/discipline for her own conduct, including repeated failures to follow procedures and/or desist from specific patterns of inappropriate communications and inappropriate interactions with other employees (largely relating to her increasing frustration/dissatisfaction with her continuing pass-over for promotion). Docket No. 41 at 12-14; Section II(A), *supra*.

To constitute "protected activity", the actions taken by an employee need not have been formal, and even activities such as making complaints to management or writing critical letters may be protected, because it is the message conveyed - not "the means of conveyance" - that determines whether the activity is protected. *Curay–Cramer v. Ursuline Acad*., 450 F.3d 130, 135 (3d Cir. 2006). The opposition to an illegal employment practice must identify the practice complained of "at least by context." *Id.*   And to adequately support a causal connection, the plaintiff "may rely on the temporal proximity between the protected activity and adverse action, if unusually suggestive, but, in the absence of such a close temporal proximity, courts consider the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action" – each of which has been raised by the record.  *See Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181 (3d Cir. 2015); *Farrell v. Planters Lifesavers Co*., 206 F.3d 271, 280-81 (3d Cir. 2000). *See* Section II(A), *supra*.[41]

---

action." *Daniels v. Sch. Dist. of Phila*., 776 F.3d 181, 193 (3d Cir. 2015) (quoting *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007)). *Cf. James Protein v. Greenman-Pederson, Inc*., 2024 WL 4471086, at *6 (W.D. Pa. Oct. 11, 2024) (noting that "the Supreme Court [has] defined retaliation broadly as conduct that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination").

Prima facie claims of retaliation under Title VII require a slightly different second element. Because the scope of Title VII's provision extends beyond employment-related retaliatory acts, a plaintiff only needs to prove a "materially adverse" action, one which "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).
[41] *Cf.* Docket No. 45-30 (Coughenour's internal documentation of a school parking lot interaction in which Plaintiff "inserted herself" into Coughenour's conversation with an employee she was "happy" was interested in an upcoming

Plaintiff has evidenced that she objected to multiple specific instances of alleged discriminatory and prior retaliatory treatment – through complaints to the School Board, the PHRC and the Court – for which she was subjected to retributive disciplinary actions and denials of promotions.  And she has sufficiently alleged and evidenced both protected activity and causally linked adverse employment actions on which to maintain a claim of discriminatory retaliation.

## V.        CONCLUSION

Although this Court may entertain doubts as to Plaintiff's ability to ultimately carry her burden of persuasion on her discrimination and/or retaliation claims, she raises - as to those claims - material fact and credibility questions which are in the sole province of the jury. Accordingly, and on the bases set forth above, Defendants' Motion for Summary Judgment (Docket No. 40) is denied.  An appropriate Order follows.

*/s/ Nora Barry Fischer*
Nora Barry Fischer,
Senior U.S. District Judge

Dated:  May 27, 2025

cc/ecf: All counsel of record

---

exam workshop, Coughenour volunteered that Plaintiff would need to re-take the test, and Plaintiff persisted in asking "the reason for retesting" after Coughenour explained that "they were making dramatic changes to the exam"). Although the exchange certainly devolved from there, the writing does not rule out that Plaintiff persisted not from obduracy but because her "question[as to] the reason for retesting" was *why an extensive exam revision was occurring* at that particular time.  *Id.* (Coughenour's experience/characterization of the encounter as another anxiety-inducing incidence of Plaintiff's continuing unprovoked attacks on Coughenour's "decisions, authority and character").